******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

PASCO COMMON CONDOMINIUM ASSOCIATION,
INC., ET AL. *v.* PAUL D.
BENSON ET AL.
(AC 39898)

Prescott, Bright and Cobb, Js.

*Syllabus*

The plaintiffs, an association of unit owners in a common interest community
that had been created pursuant to the Common Interest Ownership Act
(§ 47-200 et seq.) and eighteen individual members of that association,
brought this action alleging that the defendant B Co., the declarant, and
the defendant B, the president and chief operating officer of B Co.,
violated the provisions of a condominium declaration recorded by B
Co. by, inter alia, assessing common charges against unit owners on
the basis of a formula that deviated from the terms of the declaration.
The condominium complex was comprised of residential and commer-
cial units, one of which was occupied by a restaurant. Since the inception
of the condominium complex, B was in complete control of B Co. as
its president and chief operating officer, and he owned almost all of its
stock. Because B owned a majority of the units in the complex, he was
also in complete control of the association. B, however, did not act in
conformity with the declaration in several instances, including when he
did not follow the formula defined in the declaration for assessing
common charges to the unit owners, he made an agreement with the
restaurant exempting it from paying common charges, and he expended
association funds to finance repairs to units, for management fees, and
for vehicle and paving expenses. In 2009, pursuant to the terms of the
declaration, control of the association transitioned from an executive
board consisting of B and two members of his family to three directors:
B and two unit owners. B, however, continued to direct that common
charges be assessed pursuant to his methodology, and B Co. continued
to amend the declaration and exercise development rights through 2013,
when the plaintiffs filed the present action. In their answer and special
defenses, B and B Co. alleged that all of the plaintiffs' claims were
barred by the three year statute of limitations applicable to tort actions
(§ 52-577) and the six year statute of limitations applicable to contract
actions (§ 52-576), as B Co.'s executive control of the declaration's board
ended in 2008, pursuant to the declaration. The trial court determined
that the plaintiffs' action was not time barred until 2013, when the
plaintiffs' commenced their action, on the ground that the misconduct
of B and B Co. continued to that time and because the period of declarant
control defined by statute (§ 47-245 [d]), as well as under provisions of
the declaration, had not terminated. On the defendants' appeal to this
court, *held:*

1. The trial court incorrectly determined that the statute of limitations gov-
erning the plaintiffs' claims was tolled until the commencement of the
present action, as the statute of limitations applicable to the plaintiffs'
action against B Co. was tolled only until the period of declarant control
ended on August 12, 2008, ten years after the declaration was recorded
in 1998: that court improperly interpreted the declaration and applicable
statutes to conclude that the period of declarant control could continue
beyond the ten year limit established in § 8.10 of the declaration so long
as one of the terminating events in § 47-245 (d) and § 8.9 of the declara-
tion had not occurred, as that conclusion ignored the fact that, regardless
of the occurrence of those events, B Co.'s right to appoint and remove
executive board members expired no later than ten years after the
recording of the declaration, and, thus, although B Co. may have engaged
in conduct through 2013 consistent with control, its period of control
legally ended on August 12, 2008, ten years after the declaration was
recorded; moreover, that conclusion was supported by the language of
§ 47-245 (d), which permits a declaration to set a specific period of time
of declarant control that can be shortened only by the occurrence of
any of four terminating events set forth in the declaration, and it would
contravene the legislature's intent to permit the declaration to set a

specific period of declarant control if that period could continue beyond its set expiration as a result of the declarant's own conduct.

2. The defendants could not prevail on their claim that all of the plaintiffs' claims in counts one through eight were time barred: in light of this court's conclusion that the statute of limitations was tolled until August 12, 2008, and the fact that the present action was commenced almost five years later in July, 2013, the timeliness of the plaintiffs' action was necessarily contingent on whether the three year tort statute of limitations in § 52-577 or the six year contract statute of limitations in § 52-576 applied, and, therefore, the plaintiffs' claims that sounded in both tort and contract were not barred by § 52-576, which included its claims that B Co. had a duty to record correct unit square footage in the amendments to the declaration, that the defendants made a secret arrangement with the owner of the restaurant to exempt the restaurant from paying common charges, that the defendants improperly assessed common charges related to the improper wiring of certain common area lighting, and that the defendants improperly expended the funds of the association to finance repairs and maintenance for units and for paving expenses; nevertheless, the plaintiffs' claim that the defendants engaged in self-dealing and that B breached his fiduciary duty by remitting association funds to the defendants as a management fee, and by charging the association for B's personal vehicle expenses sounded in tort only and, thus, was barred by the statute of limitations in § 52-577.

3. The trial court improperly awarded damages to the association for common charges that should have been assessed to the restaurant, as that award was inconsistent with the court's finding that the association, which had collected 100 percent of the common charges to which it was entitled, had not been harmed or damaged by the failure of the restaurant to pay its share of common expenses, which damaged only the individual unit owners who had paid an increased amount of common charges as a result thereof, and because the individual unit owners did not seek damages, the award of damages to the association for common charges that should have been assessed to the restaurant was improper.

4. The trial court's decision to pierce the corporate veil and hold B individually liable for the misconduct of B Co. was clearly erroneous: although that court set forth findings with respect to the first element of the instrumentality rule, namely, that B exercised sufficient control over B Co., the court's decision was devoid of any findings as to the second and third elements of the instrumentality rule, as the court, with respect to the second element, set forth an exhaustive list of B's misconduct but made no findings that B used his control over B Co.'s corporate form to accomplish that misconduct, and the breaches of duty that the court attributed to B arose out of his direct relationship with the association through his position on the executive board, not through his role as owner of B Co., and because the plaintiffs sought only to hold B derivatively liable for the conduct of B Co. and B's alleged misconduct did not arise out of his control of B Co., the plaintiffs failed to satisfy the second element of the instrumentality rule; moreover, as to the third element, the court's decision did not find that B's control over B Co. proximately caused the association's injuries and B's control over the association through this position on the executive board was insufficient.

Argued March 7—officially released September 10, 2019

*Procedural History*

Action to recover damages for, inter alia, alleged violations of a condominium declaration, brought to the Superior Court in the judicial district of Hartford and tried to the court, *Scholl, J.*; judgment rendered in part for the plaintiffs, from which the defendants appealed to this court. *Reversed in part; judgment directed in part.*

*Edward S. Hill*, with whom were *John F. Harvey, Jr.*, and *P. Jo Anne Burgh*, for the appellants (defendants).

*Walter A. Twachtman, Jr.*, for the appellees (plaintiffs).

*Opinion*

BRIGHT, J. The defendants, Benson Enterprises, Inc. (declarant), and Paul D. Benson, appeal from the judgment of the trial court, rendered after a bench trial, in favor of the plaintiffs, Pasco Common Condominium Association, Inc. (association), and eighteen individual members of the association.[1] On appeal, the defendants claim that (1) the court incorrectly concluded that the statute of limitations governing the plaintiffs' claims was tolled until the commencement of the present action because the period of declarant control had not terminated, (2) the plaintiffs' action was time barred pursuant to General Statutes § 52-577, the three year statute of limitations applicable to tort actions,[2] (3) the court improperly awarded the association damages on the plaintiffs' claim that the defendants improperly assessed common charges, and (4) the court improperly determined that Benson individually was liable.[3] We agree with the defendants' first, third, and fourth claims, but we disagree in part with the defendants' second claim. Accordingly, we affirm in part and reverse in part the judgment of the trial court.

The record reveals the following relevant facts, found by the trial court or otherwise undisputed, and procedural history. On August 11, 1993, the declarant created Pasco Common, a common interest community, pursuant to the Common Interest Ownership Act (act), General Statutes § 47-200 et seq., by recording the Declaration of Pasco Common on the land records. Pasco Common is a condominium complex located in East Windsor and is comprised of dozens of residential and commercial units, one of which is occupied by a restaurant.

On August 12, 1998, the declarant recorded the operative, Amended and Restated Declaration of Pasco Common (declaration). The declaration provides for the creation of the association as a Connecticut nonstock corporation. The members of the association are the unit owners at Pasco Common, and the association is governed by an executive board. The executive board has the powers and duties to act on behalf, and manage the affairs, of the association. These powers and duties include, among other things, to adopt and amend bylaws and budgets, to collect common charges from unit owners, and to expend the funds of the association. The declaration also provides the declarant with developmental rights,[4] special declarant rights,[5] and the right to control the association.[6] The declaration provides specific time periods during which the declarant had the authority to exercise these rights. In particular, the special declarant rights expired no later than ten years after the declaration was recorded. Despite these limitations, between October 5, 1998, and March 19, 2013, the declarant recorded twenty-one amendments to the declaration, primarily to add units to Pasco Common.

Since the inception of Pasco Common, Benson was in complete control of the declarant because he was its president and chief operating officer, and he owned almost all of its stock. Between 1993 and 2009, Benson owned a majority of the units at Pasco Common,[7] and, thus, he was in complete control of the association. Prior to 2009, Benson, on behalf of the declarant, appointed the executive board members, who were his wife, Ann M. Benson, his son, Paul D. Benson, Jr., and himself. Until at least 2009, Benson, on behalf of the executive board, created the annual budgets for the association, determined the monthly common charges, decided what expenses the association would pay, decided who was responsible for repairs to the units, and conducted the business of the association without regard to whether his actions were in conformance with the terms of the declaration or the act.

For instance, Benson, on behalf of the executive board, assessed common charges to the unit owners on the basis of the square footage of each unit; these assessments, however, were improper because, inter alia, many of the square footage figures conflicted with the East Windsor land records. Further, unbeknownst to the residential unit owners, Benson and the unit owner of the restaurant, located at Pasco Common, made a special arrangement in which they agreed that the restaurant was exempt from paying common charges. Benson also improperly expended the association's funds to finance repairs he made to units, for management fees, for vehicle expenses, and for paving expenses.

In 2009, shortly after the period of declarant control provided for in the declaration ended, control of the association transitioned from the executive board that included Benson, his wife, and his son to an executive board that consisted of three directors: Benson, Steven Fowler, and Rene Dupuis. Fowler and Dupuis are unit owners and plaintiffs. At the same time, management of the association transitioned from the declarant to Advance Property Management and then, in 2011, to Elite Property Management. Nevertheless, Benson directed the new management of the association to continue to assess common charges pursuant to his own methodology, as opposed to the method prescribed by the declaration. Furthermore, the declarant continued to amend the declaration and exercise development rights through 2013.

In July, 2013, the plaintiffs commenced the present action against the defendants. The plaintiffs' operative, amended complaint contains ten counts. In counts one through eight, the plaintiffs allege that the declarant violated the declaration as well as certain provisions of the act[8] by assessing common charges against unit owners on the basis of a formula that deviated from the terms of the declaration; issuing an inadequate,

incorrect, and misleading public offering statement; failing to keep adequate records of the association's finances; modifying and creating units without the approval or notice to the executive board; failing to pay its correct proportion of the common charges; misrepresenting the true nature and composition of Pasco Common by failing to disclose that the restaurant was a unit and that the declarant would maintain total control over the association; amending the declaration without notice or approval by the executive board; and creating a garage unit. In count nine, the plaintiffs allege that the declarant violated the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. In count ten, the plaintiffs allege a piercing of the corporate veil count against Benson. In response, the defendants filed their operative answer and special defenses in which they allege, inter alia, that all of the plaintiffs' claims were time barred pursuant to § 52-577, the three year statute of limitations applicable to tort actions, and/or General Statutes § 52-576, the six year statute of limitations applicable to contract actions.[9]

On October 25, 2016, after a ten day bench trial, the court issued a memorandum of decision in which it rendered judgment for the plaintiffs against the declarant on counts one through eight, for the declarant on count nine, and for the plaintiffs against Benson individually on count ten.[10]

With respect to the defendants' statute of limitations special defense, the court held that the statute of limitations had been tolled, pursuant to General Statutes § 47-253 (d),[11] until 2013, because the period of declarant control, as defined by General Statutes § 47-245 (d),[12] had not terminated as result of the defendants' continued misconduct. As a result, the court held that the plaintiffs' action was not time barred, except for count nine, the CUTPA claim, which the court determined was time barred by the three year statute of limitations because the plaintiffs had not raised their tolling claim as to that count until after trial.[13] As to the plaintiffs' other claims, the court, in light of its conclusion that any statute of limitations was tolled, did not make a determination as to whether the tort, contract, or some other statute of limitations was applicable. Consequently, the court awarded the association compensatory damages and ordered the defendants to take certain remedial actions. This appeal followed. Additional facts will be set forth as necessary.

On appeal, the defendants claim that (1) the court incorrectly concluded that the statute of limitations governing the plaintiffs' claims was tolled until the commencement of the present action because the period of declarant control had not terminated, (2) the plaintiffs' action was time barred pursuant to § 52-577, (3) the court improperly awarded the association damages on the plaintiffs' claim that the defendants improperly

assessed common charges, and (4) the court improperly determined that Benson individually was liable.

I

The defendants first claim that the court incorrectly concluded that the statute of limitations governing the plaintiffs' claims was tolled until the commencement of the present action because the period of declarant control had not terminated. The defendants argue that the declaration set a ten year limit on the period of declarant control, and, thus, the statute of limitations was tolled only until 2008. They also argue that the tolling provision, § 47-253 (d), applies only to toll claims against the declarant, not Benson individually. The plaintiffs counter that the court properly determined that, notwithstanding the period provided by the declaration, the period of declarant control, in fact, continued until 2013 because the declarant continued to exercise special declarant rights through 2013. We agree with the defendants.

We begin by setting forth the applicable standard of review and relevant legal principles governing our resolution of the defendants' first claim. The interpretation of the relevant provisions of the act and the definitive language of the declaration are pure questions of law over which we exercise plenary review. See *Commissioner of Emergency Services & Public Protection* v. *Freedom of Information Commission*, 330 Conn. 372, 380, 194 A.3d 759 (2018) (interpretation of statute is question of law); *Harbour Pointe, LLC* v. *Harbour Landing Condominium Assn., Inc.*, 300 Conn. 254, 259, 14 A.3d 284 (2011) (interpretation of definitive language in condominium declaration, which operates as contract, is question of law).

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reason-

able interpretation." (Internal quotation marks omitted.) *Hynes* v. *Jones*, 331 Conn. 385, 392–93, 204 A.3d 1128 (2019).

"It is a basic tenet of statutory construction that the legislature [does] not intend to enact meaningless provisions. . . . [I]n construing statutes, we presume that there is a purpose behind every sentence, clause, or phrase used in an act and that no part of a statute is superfluous. . . . Because [e]very word and phrase [of a statute] is presumed to have meaning . . . [the statute] must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant." (Citations omitted; internal quotation marks omitted.) *American Promotional Events, Inc.* v. *Blumenthal*, 285 Conn. 192, 203, 937 A.2d 1184 (2008). "We are not in the business of writing statutes; that is the province of the legislature. Our role is to interpret statutes as they are written. . . . [We] cannot, by [judicial] construction, read into statutes provisions [that] are not clearly stated." (Internal quotation marks omitted.) *Thomas* v. *Dept. of Developmental Services*, 297 Conn. 391, 412, 999 A.2d 682 (2010).

"When construing a contract, we seek to determine the intent of the parties from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so." (Internal quotation marks omitted.) *Gabriel* v. *Gabriel*, 324 Conn. 324, 341, 152 A.3d 1230 (2016). "[Additionally], in construing contracts, we give effect to all the language included therein, as the law of contract interpretation . . . militates against interpreting a contract in a way that renders a provision superfluous." (Internal quotation marks omitted.) *Awdziewicz* v. *Meriden*, 317 Conn. 122, 130, 115 A.3d 1084 (2015).

We next turn to the relevant provisions of the act. "The act is a comprehensive legislative scheme regulating all forms of common interest ownership that is largely modeled on the Uniform Common Interest Ownership Act. . . . The act addresses the creation, organization and management of common interest communities and contemplates the voluntary participation of the owners. It entails the drafting and filing of a declaration describing the location and configuration of the real property, development rights, and restrictions on its use, occupancy and alienation . . . the enactment of bylaws . . . the establishment of a unit owners' association . . . and an executive board to act on . . .

behalf [of the association]. . . . It anticipates group decision-making relating to the development of a budget, the maintenance and repair of the common elements, the placement of insurance, and the provision for common expenses and common liabilities." (Internal quotation marks omitted.) *Grovenburg* v. *Rustle Meadow Associates, LLC*, 174 Conn. App. 18, 22–23 n.2, 165 A.3d 193 (2017); see also *Fruin* v. *Colonnade One at Old Greenwich Ltd. Partnership*, 237 Conn. 123, 130–31, 676 A.2d 369 (1996) (outlining five major parts of the act).

The act specifies who may bring an action to enforce its provisions. General Statutes § 47-278 (a) provides in relevant part: "A declarant, association, unit owner or any other person subject to this chapter may bring an action to enforce a right granted or obligation imposed by this chapter, the declaration or the bylaws. . . ." The act makes the declarant liable to the association. Section 47-253 (c) provides: "The declarant is liable to the association for all funds of the association collected during the period of declarant control which were not properly expended." The act also provides that the statute of limitations applicable to such action brought against a declarant is tolled while the declarant is in control of the association. Section 47-253 (d) provides in relevant part: "Any statute of limitation affecting the association's right of action against a declarant under this chapter is tolled until the period of declarant control terminates."

The period of declarant control is defined by § 47-245 (d), which provides in relevant part: "[T]he declaration may provide for a period of declarant control of the association, during which a declarant, or persons designated by the declarant, may appoint and remove the officers and members of the executive board. A declarant may voluntarily surrender the right to appoint and remove officers and members of the executive board before the period ends. In that event, the declarant may require, during the remainder of the period, that specified actions of the association or executive board, as described in a recorded instrument executed by the declarant, be approved by the declarant before they become effective. Regardless of the period provided in the declaration, a period of declarant control terminates no later than the earlier of: (1) Sixty days after conveyance of sixty per cent of the units that may be created to unit owners other than a declarant . . . or, if no such number is specified, after conveyance to unit owners other than the declarant of three hundred units; (2) two years after all declarants have ceased to offer units for sale in the ordinary course of business; (3) two years after any right to add new units was last exercised; or (4) the date the declarant, after giving notice in a record to unit owners, records an instrument voluntarily surrendering all rights to control activities of the association."

The plain and unambiguous language of § 47-245 (d) demonstrates that the legislature intended that the period of declarant control terminate on the occurrence of one of the terminating events or, at the latest, at the end of the period set by the declaration. The first sentence of the subsection permits a declaration to set a period of time for declarant control. The second and third sentences permit a declarant to voluntarily surrender his control over the association before the period ends, and to reserve its right of approval. The fourth sentence then provides that the first occurrence of any four terminating events would end the period of declarant control regardless of the time period set by the declaration. To give effect to both the first and fourth sentences of § 47-245 (d), the period of declarant control set by a declaration must serve as the maximum time period, which can be shortened only by the first occurrence of any of the four terminating events. The first sentence permitting a declaration to set a period of declarant control has meaning only if it serves as the outer limit of declarant control because, otherwise, the statute would permit a declaration to set a period of time that necessarily would have no effect if the period of declarant control ended only on the earliest of the four terminating events. Thus, § 47-245 (d) permits a declaration to set a specific period of declarant control, which can be shortened only by the declarant voluntarily surrendering control or by the occurrence of any of the four terminating events outlined in subdivisions (1) through (4).

Because, pursuant to § 47-245 (d), the declaration can set forth the period of declarant control, we turn to the language of the declaration at issue in the present case. Article VIII of the declaration, titled "Development Rights and Other Special Declarant Rights," specifically provides a ten year period of declarant control. Section 8.10 of the declaration, titled "Limitations on Special Declarant Rights," provides: "Unless sooner terminated by a recorded instrument executed by the [d]eclarant, any [s]pecial [d]eclarant [r]ight may be exercised by the [d]eclarant during such period of time as the [d]eclarant is obligated under any warranty or obligation, holds a [d]evelopment [r]ight to create additional [u]nits or [c]ommon [e]lements, owns any [u]nit, or holds any [s]ecurity [i]nterest in any [u]nit, or for 10 years after recording this [d]eclaration, whichever is earliest. Earlier termination of certain rights may occur by statute." Section 8.4 of the declaration, titled "Special Declarant Rights," defines the special declarant rights subject to the limitations in § 8.10. Section 8.4 provides in relevant part: "The [d]eclarant reserves the following [s]pecial [d]eclarant [r]ights, to the maximum extent permitted by law, which may be exercised, where applicable, anywhere within [Pasco Common] . . . . (e) To appoint or remove any officer of the [a]ssociation or any [e]xecutvie [b]oard member during any period

of [d]eclarant control subject to the provisions of [§] 8.9 of this [d]eclaration."

Section 8.9 of the declaration, titled "Declarant Control of Association," provides in relevant part: "There shall be a period of [d]eclarant control of the [a]ssociation, during which the [d]eclarant, or persons designated by it, may appoint and remove the officers and members of the [e]xecutive [b]oard. The period of [d]eclarant control shall terminate no later than the earlier of:

"(i) sixty (60) days after conveyance of sixty percent . . . of the [u]nits [that] may be created to [u]nit [o]wners other than a [d]eclarant, a shareholder thereof, or his or her spouse, or other member of the immediate family;

"(ii) two (2) years after all [d]eclarants have ceased to offer [u]nits for sale in the ordinary course of business; or

"(iii) [e]ight (8) years after any right to add new [u]nits was last exercised.

"A [d]eclarant may voluntarily surrender the right to appoint and remove officers and members of the [e]xecutive [b]oard before termination of that period, but in that event the [d]eclarant may require, for the duration of the period of [d]eclarant control, that specified actions of the [a]ssociation or [e]xecutive [b]oard as described in a recorded instrument executed by the [d]eclarant be approved by the [d]eclarant before they become effective."

The court determined that § 47-253 (d) tolled any statute of limitations until 2013 because none of the events listed in § 8.9 and § 47-245 (d) (1) through (4) had occurred earlier to terminate the period of declarant control.[14] The court concluded that the ten year limit on the exercise of the special declarant rights set forth in § 8.10 of the declaration was not applicable to its analysis because "[t]he plain meaning of the declaration, which defines what special declarant rights may be exercised during the period of declarant control, is that the term of declarant control may be longer than the time in which the declarant may exercise special declarant rights." We disagree.

When §§ 8.4, 8.9, and 8.10 are read together, it is clear that the declaration set a ten year limit on the period of declarant control. Section 8.9, in relevant part, defines the period of declarant control as the time "during which the [d]eclarant . . . may appoint and remove the officers or members of the [e]xecutive [b]oard." Section 8.4 defines one of the declarant's special declarant rights as the right "[t]o appoint or remove any officer of the [a]ssociation or any [e]xecutive [b]oard member during any period of [d]eclarant control subject to the provisions of [§] 8.9 of this [d]eclaration." Finally, § 8.10 provides that the special declarant rights terminate no later than ten years after the recording of the declara-

tion. Thus, the declarant's right to appoint and remove board members terminated no later than ten years after the recording of the declaration. Because the right to appoint and remove executive board members is the definition of declarant control under § 8.9, the loss of that right necessarily meant the end of declarant control. See *Cantonbury Heights Condominium Assn., Inc.* v. *Local Land Development, LLC*, 273 Conn. 724, 734, 873 A.2d 898 (2005) (interpreting declaration to determine that limitation on authority to exercise special declarant rights effectively operated as limitation on developmental rights, where declaration provides that developmental right is special declarant right). Consequently, declarant control under the declaration necessarily ended no later than ten years after the recording of the declaration, regardless of whether any of the events in § 8.9 of the declaration or § 47-245 (d) had occurred.

The court's construction of the declaration does not take into account the interplay of §§ 8.4, 8.9, and 8.10. The court, therefore, improperly interpreted the declaration and the applicable statutes to conclude that the period of declarant control could continue beyond the ten year limit in § 8.10 as long as one of the events in § 47-245 (d) and § 8.9 had not occurred. Such a conclusion ignores the fact that, regardless of the occurrence of those events, the declarant's right to appoint and remove executive board members, which is what gave the declarant control, expired no later than ten years after the recording of the declaration. Although the declarant may have engaged in conduct through 2013 consistent with control, its period of control legally ended on August 12, 2008, ten years after the declaration was recorded. Thus, we agree with the defendants that any statute of limitations for claims by the association against the declarant was tolled, pursuant to §§ 47-245 (d) and 47-253 (d), only until August 12, 2008.[15]

This conclusion is not only required by the clear language of the declaration, it is also consistent with the language of § 47-245 (d). The first sentence of § 47-245 (d) explicitly sets forth the option to include a specific period of declarant control in the declaration. It would contravene the legislature's intent to permit the declarant to set a specific period of declarant control if that period could continue beyond its set expiration as a result of the declarant's own conduct. If the legislature intended to terminate the period of declarant control only on the occurrence of one of the four terminating events in the fourth sentence of § 47-245 (d), it would not have included the option for the declarant to select a different date for the termination of declarant control. Instead, this subsection expressly permits a declarant to set a specific period of declarant control that serves as the maximum time, which can be shortened only by the occurrence of any of the four terminating events.

Finally, our conclusion is consistent with the purpose of the tolling provision of § 47-253 (d). Tolling the statute of limitations applicable to claims against the declarant while it is in control of the association allows the association and its unit members sufficient time after the termination of the period of declarant control to know whether the declarant has engaged in any wrongful conduct. When the period of declarant control ends, that control is transitioned to the individual members of the association. See § 47-245 (f) and (h). In the present case, an executive board took over legal control of the association in 2009, shortly after the period of declarant control ended. That board, which included two unit owners in addition to Benson, had the legal right to control the affairs of the association, as well as the right to access all of the association's books and records. Consequently, it is logical that the tolling of any statute of limitations would end as soon as the declarant loses the legal ability to control the affairs of the association.

In the present case, because the declaration was recorded on August 12, 1998, the declarant's right to exercise its special declarant rights, and, thus, the period of declarant control, expired a maximum of ten years later, on August 12, 2008.[16] Accordingly, we conclude, contrary to the trial court's determination, that the statute of limitations applicable to the association's action against the declarant was tolled only until the period of declarant control ended on August 12, 2008.[17]

II

Having concluded that any applicable statute of limitations was tolled only until August 12, 2008, we turn to the defendants' claim that all of the plaintiffs' claims in counts one through eight are time barred.[18] In light of our conclusion in part I of this opinion that the statute of limitations was tolled until August 12, 2008, and the present action was commenced almost five years later in July, 2013, the timeliness of the plaintiffs' action is necessarily contingent on whether the three year tort statute of limitations, or the six year contract statute of limitations, applies to the plaintiffs' action. As a result, although the trial court did not make such a determination because it determined that the statute of limitations was tolled until 2013, it is necessary for us to determine which statute of limitations applies to the plaintiffs' claims. See *Designs for Health, Inc.* v. *Miller*, 187 Conn. App. 1, 14 n.9, 201 A.3d 1125 (2019) ("remand unnecessary where record on appeal sufficient to make determination as matter of law").

The defendants argue that the plaintiffs' claims are governed by § 52-577, the three year statute of limitations applicable to tort actions, because the legal duties alleged to have been breached stemmed from the provisions of the act, not the declaration. The plaintiffs take

the position, without any analysis,[19] that § 52-576, the six year contract statute of limitations, applies because the declaration operates as a contract among the parties. We conclude that some of the plaintiffs' claims are tort claims that are time barred pursuant to § 52-577, but that the remainder of the claims sound in both contract and tort and, thus, are not time barred by § 52-576.

We begin by setting forth the applicable standard of review and relevant legal principles governing our resolution of this issue. The determination of which statute of limitations applies to an action is a question of law over which our review is plenary. See *Vaccaro* v. *Shell Beach Condominium, Inc.*, 169 Conn. App. 21, 29, 148 A.3d 1123 (2016), cert. denied, 324 Conn. 917, 154 A.3d 1008 (2017). Furthermore, to the extent that we are required to interpret the plaintiffs' pleadings, our review also is plenary. See *Byrne* v. *Avery Center for Obstetrics & Gynecology, P.C.*, 314 Conn. 433, 462, 102 A.3d 32 (2014).

"Public policy generally supports the limitation of a cause of action in order to grant some degree of certainty to litigants. . . . The purpose of [a] statute of limitation . . . is . . . to (1) prevent the unexpected enforcement of stale and fraudulent claims by allowing persons after the lapse of a reasonable time, to plan their affairs with a reasonable degree of certainty, free from the disruptive burden of protracted and unknown potential liability, and (2) to aid in the search for truth that may be impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents or otherwise. . . . Therefore, when a statute includes no express statute of limitations,[20] we should not simply assume that there is no limitation period. Instead, we borrow the most suitable statute of limitations on the basis of the nature of the cause of action or of the right sued upon." (Citations omitted; footnote added; internal quotation marks omitted.) *Bellemare* v. *Wachovia Mortgage Corp.*, 284 Conn. 193, 199, 931 A.2d 916 (2007).

Generally, "[w]hether [a] plaintiff's cause of action is one for [tort or contract] depends upon the definition of [those terms] and the allegations of the complaint." (Internal quotation marks omitted.) *Meyers* v. *Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, 311 Conn. 282, 291, 87 A.3d 534 (2014). "[T]he fundamental difference between tort and contract lies in the nature of the interests protected. . . . The duties of conduct which give rise to [a tort action] are imposed by the law, and are based primarily upon social policy, and not necessarily upon the will or intention of the parties. . . . Furthermore, other courts have held that, when a plaintiff seeks to recover damages for the breach of a statutory duty, such an action sounds in tort. See, e.g., *Curtis* v. *Loether*, 415 U.S. 189, 195, 94 S. Ct. 1005, 39

L. Ed. 2d 260 (1974) (damages action pursuant to statute sounds in tort because it defines new legal duty and authorizes courts to compensate plaintiff for injury caused by defendant's wrongful breach of duty); *Federal Deposit Ins. Corp.* v. *Citizens Bank & Trust Co.*, 592 F.2d 364, 368–69 (7th Cir.) (liability for breach of duty imposed by statute sounds in tort), cert. denied, 444 U.S. 829, 100 S. Ct. 56, 62 L. Ed. 2d 37 (1979).

"On the other hand, [c]ontract actions are created to protect the interest in having promises performed. Contract obligations are imposed because of [the] conduct of the parties manifesting consent, and are owed only to the specific individuals named in the contract. . . . In short, [a]n action in contract is for the breach of a duty arising out of a contract; an action in tort is for a breach of duty imposed by law." (Citations omitted; internal quotation marks omitted.) *Bellemare* v. *Wachovia Mortgage Corp.*, supra, 284 Conn. 200.

"[I]t is well established that . . . [s]ome complaints state a cause of action in both contract and tort. . . . [O]ne cannot bring an action [under both theories, however,] merely by couching a claim that one has breached a standard of care in the language of contract. . . . [T]ort claims cloaked in contractual language are, as a matter of law, not breach of contract claims. To ensure that plaintiffs do not attempt to convert [tort] claims into breach of contract claims by talismanically invoking contract language in [the] complaint . . . reviewing courts may pierce the pleading veil by looking beyond the language used in the complaint to determine the true basis of the claim." (Citations omitted; internal quotation marks omitted.) *Meyers* v. *Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, supra, 311 Conn. 290–92.

Furthermore, although the issue of whether a claim sounds in tort or contract sometimes is a binary determination, that is not always the case. See *Stowe* v. *Smith*, 184 Conn. 194, 199, 441 A.2d 81 (1981) (some complaints allege both contract and tort); *Doe* v. *Boy Scouts of America Corp.*, 323 Conn. 303, 342, 147 A.3d 104 (2016) (two different statute of limitations can apply to claims arising from same set of alleged facts); see also 51 Am. Jur. 2d 547, Limitation of Actions § 76 (2016) ("If two or more statutes of limitation within a jurisdiction may apply to a cause of action, generally the statute providing the longest limitation period is preferred and will be applied. Any doubt as to the application of two or more statutes of limitation to a claim should be resolved in favor of the longest limitation period. Thus, when two statutes of limitation conflict, or when a claim may be pursued on two theories having different limitation periods, the longer limitation period applies." [Footnotes omitted.]).

With respect to the interpretation of pleadings, our Supreme Court has "long . . . eschewed the notion

that pleadings should be read in a hypertechnical manner. Rather, [t]he modern trend, which is followed in Connecticut, is to construe pleadings broadly and realistically, rather than narrowly and technically. . . . [T]he complaint must be read in its entirety in such a way as to give effect to the pleading with reference to the general theory upon which it proceeded, and do substantial justice between the parties. . . . Our reading of pleadings in a manner that advances substantial justice means that a pleading must be construed reasonably, to contain all that it fairly means, but carries with it the related proposition that it must not be contorted in such a way so as to strain the bounds of rational comprehension. . . . Although essential allegations may not be supplied by conjecture or remote implication . . . the complaint must be read in its entirety in such a way as to give effect to the pleading with reference to the general theory upon which it proceeded, and do substantial justice between the parties." (Internal quotation marks omitted.) *Byrne* v. *Avery Center for Obstetrics & Gynecology, P.C.*, supra, 314 Conn. 462.

Moreover, "it is true that ordinarily a court may not grant relief on the basis of an unpleaded claim. . . . That does not necessarily mean, however, that the absence of a particular claim from the pleadings automatically precludes a trial court from addressing the claim, because a court may, despite pleading deficiencies, decide a case on the basis on which it was actually litigated and may, in such an instance, permit the amendment of a complaint, even after the trial, to conform to that actuality. Indeed, [our Supreme Court has] recognized that, even in the absence of such an amendment, where the trial court had in fact addressed a technically unpleaded claim that was actually litigated by the parties, it was improper for the Appellate Court to reverse the trial court's judgment for lack of such an amendment." (Citations omitted; internal quotation marks omitted.) *Stafford Higgins Industries, Inc.* v. *Norwalk*, 245 Conn. 551, 575, 715 A.2d 46 (1998); see also *Tedesco* v. *Stamford*, 215 Conn. 450, 457–60, 576 A.2d 1273 (1990) (affirming judgment of trial court in favor of plaintiff even though claim insufficiently pleaded because defendant had sufficient notice of claim that actually was litigated). Despite pleading deficiencies, a court is permitted to "decide a case on the basis on which it was actually litigated . . . ." (Internal quotation marks omitted.) *Stamford Landing Condominium Assn., Inc.* v. *Lerman*, 109 Conn. App. 261, 273, 951 A.2d 642 (trial court properly determined that plaintiff was entitled to damage award of common charges because such claim, although not explicitly alleged, was litigated), cert. denied, 289 Conn. 938, 958 A.2d 1246 (2008).

Our Supreme Court repeatedly has held that "[a] declaration is an instrument recorded and executed in the same manner as a deed for the purpose of creating

a common interest community. . . . [T]he declaration operates in the nature of a contract, in that it establishes the parties' rights and obligations . . . ." (Citations omitted; internal quotation marks omitted.) *Southwick at Milford Condominium Assn., Inc.* v. *523 Wheelers Farm Road, Milford, LLC*, 294 Conn. 311, 313 n.3, 984 A.2d 676 (2009); see *Harbour Pointe, LLC* v. *Harbour Landing Condominium Assn., Inc.*, supra, 300 Conn. 259; *Cantonbury Heights Condominium Assn., Inc.* v. *Local Land Development, LLC*, supra, 273 Conn. 734; see also *Grovenburg* v. *Rustle Meadow Associates, LLC*, supra, 174 Conn. App. 46. Furthermore, we have recognized that an action for a breach of the declaration is an action for a breach of contract. See *Elm Street Builders, Inc.* v. *Enterprise Park Condominium Assn., Inc.*, 63 Conn. App. 657, 664–69, 778 A.2d 237 (2001). Accordingly, we must determine whether the plaintiffs' claims, as litigated, allege a breach of duty stemming from the declaration, which would be a contract claim, and/or a breach of duty stemming from the act, which would be a tort claim.

At the outset of our analysis, we note that our review of whether the plaintiffs' claims sound in contract or tort is complicated by the fact that the complaint alleges overlapping claims and subclaims, and the fact that the court analyzed the claims as framed by the parties in their posttrial briefs, which substantially differ from the claims alleged in the plaintiffs' complaint. In particular, the plaintiffs' posttrial brief contained seventeen one sentence headings that asserted a myriad of different claims against the defendants on the basis of the evidence presented at trial, and the defendants' posttrial brief mirrored those seventeen headings. The court, in its posttrial memorandum of decision, utilized the same claim framework used by the parties in their posttrial briefs to determine whether the plaintiffs prevailed and, consequently, to award the association relief on those claims.

In contrast, the complaint alleges a blunderbuss of claims, which are not entirely represented in the headings used by the court and the parties. In addition, there were a number of narrow claims discussed in the posttrial briefs and ruled on by the court that are not *specifically* alleged in the complaint.[21] Instead, the complaint contains broad claims against the defendants, and those broad claims were then narrowed by the plaintiffs' posttrial brief. This problem is compounded by the fact that the defendants advance a general argument that all of the claims are time barred, without analyzing any of the individual claims and the lack of any analysis by the plaintiffs with respect to this issue.

Consequently, in an effort to read the complaint "in its entirety in such a way as to give effect to the pleading with reference to the general theory upon which it proceeded, and do substantial justice between the parties"

we analyze the broad claims alleged in the plaintiffs' complaint that were further articulated by their posttrial brief. *Byrne* v. *Avery Center for Obstetrics & Gynecology, P.C.*, supra, 314 Conn. 462. We take this approach because the court ruled, and the parties' briefed, the claims as articulated in the posttrial brief, not the complaint. Further, this approach takes into account the general theory on which the plaintiffs' claims were pursued, and does not prejudice the defendants because they defended the claims as outlined in the plaintiffs' posttrial brief. See footnote 19 of this opinion. The defendants did not file a request to revise in order to clarify the substance of the plaintiffs' claims and, indeed, opposed the plaintiffs' posttrial request to amend the complaint to conform to the proof at trial, which objection was sustained by the court. See *Stafford Higgins Industries, Inc.* v. *Norwalk*, supra, 245 Conn. 575; *Tedesco* v. *Stamford*, supra, 215 Conn. 457–60; *Stamford Landing Condominium Assn., Inc.* v. *Lerman*, supra, 109 Conn. App. 273.

In light of the foregoing, we turn to consider whether the tort or contract statute of limitations applies to each of the following four claims that were broadly alleged in the plaintiff's complaint, further articulated by their posttrial brief, and on which the court awarded relief.[22]

A

First, the plaintiffs claim that common expenses assessed to each unit were to be determined, pursuant to the declaration, on the basis of each units' relative floor area compared to the floor area of all the units. They allege that the declarant recorded inaccurate floor areas of the units on the Schedule A-2 attached to each amendment to the declaration. The plaintiffs allege that the declarant's conduct violated the declaration and General Statutes §§ 47-224 and 47-226. The court awarded the plaintiffs equitable relief in the form of an order mandating that the declarant correct the most recent Schedule A-2.

We conclude that the duty of the declarant to record correct unit square footage in the amendments to the declaration is both a tort and contract claim. The act mandates that the declaration, and any amendments thereto, provide each unit's boundaries and its percentage interest in the community as a whole. General Statutes § 47-202 (15) provides: " 'Declaration' means any instruments, however denominated, that create a common interest community, including any amendments to those instruments." Section 47-224 provides in relevant part: "(a) The declaration shall contain . . . (5) In a condominium or planned community, a description of the boundaries of each unit created by the declaration, including the unit's identifying number . . . ." Section 47-226 provides in relevant part: "(a) The declaration shall allocate to each unit: (1) In a condominium, a fraction or percentage of undivided interests in the com-

mon elements and in the common expenses of the association, and a portion of the votes in the association . . . ." Further, the plaintiffs specifically allege in their complaint that the declarant violated §§ 47-224 and 47-226. Thus, because the act mandates that the declaration contain these denominations, the duty to correctly record them flows from the act.

Nevertheless, this claim also sounds in contract. The allocation of interests on the basis of each unit's square footage also is mandated by the declaration. Section 9.1 of the declaration provides in relevant part: "The table showing [u]nit numbers and their allocated interests is attached as Schedule A-2. These interests have been allocated in accordance with the formulas set out in this [a]rticle . . . . These formulas are to be used in reallocating interests if [u]nits are added to [Pasco Common]. Section 15.8 of the declaration provides that when new units are added, "the [d]eclarant shall prepare, execute and record an amendment to the [d]eclaration. If necessary, the [d]eclarant shall aslo record either new [s]urveys and [p]lans . . . or new certifications of Schedules A-3 and A-4 . . . .

"The amendment to the [d]eclaration shall assign an identifying number to each new [u]nit created and reallocate the [a]llocated [i]nterests among all [u]nits. The amendment shall describe any [c]ommon [e]lements and [l]imited [c]ommon [e]lements created thereby and designate the [u]nit to which each [l]imited [c]ommon [e]lement is allocated . . . ." In accordance with the foregoing provisions, the duty to correctly file amendments to the Schedule A-2 also derives from the declaration. In addition, the plaintiffs explicitly allege in their complaint that the declarant's conduct violated the declaration. Therefore, we conclude that this claim sounds in both tort and contract.

B

Second, the plaintiffs claim that the defendants wired certain common area lights to individual units so that those unit owners inappropriately were being assessed, and paying, common expenses, and that the defendants made a special arrangement with the owner of the restaurant unit in which they agreed that the restaurant was exempt from paying common charges. They allege that the unit owners were not made aware of the wiring or the special arrangement. The court awarded the association $126,766.11 for common charges that should have been assessed against the restaurant, and the court awarded equitable relief in the form of an order mandating that the defendants produce a new wiring plan for approval by the executive board.

We conclude that the claim arising out of the secret arrangement made with the owner of the restaurant and the assessing of common charges related to the improper wiring of certain common area lighting is both

a tort claim and a contract claim. Section 47-245 (a) provides in relevant part: "Except as provided in the declaration, the bylaws, subsection (b) of this section, or other provisions of this chapter, the executive board may act in all instances on behalf of the association. In the performance of their duties, officers and members of the executive board appointed by the declarant shall exercise the degree of care and loyalty to the association required of a trustee and officers . . . ." General Statutes § 47-211 provides in relevant part: "Every . . . duty governed by this chapter imposes an obligation of good faith in its performance or enforcement." See *Chioffi* v. *Martin*, 181 Conn. App. 111, 138–39, 186 A.3d 15 (2018) (outlining common-law tort elements of breach of fiduciary duty). As there is no provision of the declaration that provides otherwise, the duty imposed on Benson, as a member of the executive board, and the declarant, as the founder of Pasco Common, to refrain from acting as a fiduciary to the detriment of the plaintiffs is a legal one imposed by the act. Indeed, in articulating their claim in their posttrial brief, the plaintiffs specifically assert that the defendants "failed to perform [their] fiduciary dut[ies] . . . ."

Moreover, this claim also is one for breach of contract because the declaration mandates that each unit owner, including the restaurant, is responsible for common charges. Section 9.2 (b) provides in relevant part: "The percentage of liability for [c]ommon [e]xpenses allocated to each [u]nit is based on the relative floor area of each [u]nit as compared to the floor area of all of the [u]nits in the [c]ommon [i]nterest [c]ommunity. . . . Nothing contained in this [s]ubsection shall prohibit certain [c]ommon [e]xpenses from being apportioned to particular [u]nits under Article XIX of this Declaration." Section 19.1 of the declaration, which is contained in Article XIX of the declaration, provides that "[c]ommon [e]xpenses shall include," among other things, "[e]xpenses of administration, maintenance, and repair or replacement of the [c]ommon [e]lements," and "[e]xpenses declared to be [c]ommon [e]xpenses by the [d]ocuments or by the [a]ct . . . ." According to these provisions, the declaration mandates that each unit owner is liable for common expenses. Thus, the allegation that the restaurant was made exempt from common charges is a claim for a breach of the declaration. Moreover, in framing their claim in their posttrial brief, the plaintiffs assert "[t]here is no exception set forth in the [d]eclaration, which would eliminate a unit owner from the obligation to pay normal common charges." Similarly, a claim that the declarant charged individual unit owners for lighting expenses that should have been common expenses alleges a breach of the declaration.

### C

The plaintiffs claim that the defendants improperly expended the funds of the association to finance repairs

and maintenance for units and for paving expenses. In particular, the plaintiffs claim that, during the development of Pasco Common, the defendants repaired and maintained some of the older units, most of which were owned by the defendants, and repaved a parking lot. They allege that the defendants improperly charged the association for such repairs. In connection with this claim, the court awarded the association $106,173 for repairs and maintenance and $45,298 for paving expenses.

We conclude that the defendants' alleged improper expenditure of the association's funds for maintenance and repair of their units and for paving is both a tort claim and a contract claim. The duty of the declarant to expend properly the funds of the association stems from § 47-253 (c), which provides: "The declarant is liable to the association for all funds of the association collected during the period of declarant control which were not properly expended." Our legislature, in enacting this provision, codified a social policy that the declarant must properly expend the funds of the association. The claim that the declarant improperly expended funds is tortious because the duty alleged to have been breached flows from § 47-253 (c). Indeed, count five of the plaintiffs' complaint incorporates the prior four counts and merely alleges that the declarant's conduct violated § 47-253 (c).

Furthermore, the mandate as to which party is responsible for repair and maintenance is outlined by General Statutes § 47-249 (a), which provides in relevant part: "Except to the extent provided by the declaration . . . the association is responsible for maintenance, repair and replacement of the common elements, and each unit owner is responsible for maintenance, repair and replacement of his unit. . . ." To the extent that the plaintiffs' claim alleges that the defendants improperly charged the association for repairs and maintenance, such a claim alleges a violation of the mandate of § 47-249 (a). Moreover, in describing this claim in their posttrial brief, the plaintiffs specifically assert that the defendants had "a fiduciary duty to manage the financial affairs of the association in a lawful and proper fashion," and that "[s]ince the declarant/ Benson charged maintenance and repair for many of the units, especially the older ones owned by the declarant, to the association and since the declarant/Benson is in a fiduciary capacity to the association, the plaintiffs claim that the entire repair and maintenance category should be paid back to the association by the declarant/ Benson." Accordingly, this claim is a tort claim.

Nonetheless, this claim also is a contract claim because Article VI of the declaration prescribes which party is responsible for repairs and maintenance. Section 6.1 of the declaration provides that the association is responsible for the maintenance, repair, and replace-

ment of the common elements of Pasco Common, except that a party that has "legal or equitable ownership of all units within one structure" is responsible for all interior and exterior maintenance, repair, and replacement of that structure. Section 6.2 of the declaration provides that the unit owners are responsible for the maintenance, repair, and replacement of "all portions of his or her [u]nit . . . ." Section 6.3 provides that, notwithstanding §§ 6.1 and 6.2, each unit owner is responsible for "maintenance, repair and replacement" of "the exterior building, including but not limited to the siding, roof and paint" and of the limited common elements, which are the "space heating, water heating and air conditioning apparatus and all electrical switches, television, telephone, and electrical receptacles . . . serving [that] one [u]nit exclusively . . . ." In addition, the plaintiffs assert in their posttrial brief that the defendants' improper expenditure of common expenses was in violation of the declaration. Therein, they also cite a number of provisions of the declaration that they maintain are in conflict with each other. In addition, the defendants recognized the contractual nature of this claim because their counterargument made in their posttrial brief substantially relied on the provisions of the declaration, and the court decided the issue on the basis of the provisions of the declaration cited by the plaintiffs. Thus, this claim also is a contract claim.

D

The plaintiffs also claim that the defendants engaged in self-dealing and that Benson breached his fiduciary duty by remitting association funds to the defendants as a "management fee," and by charging the association for Benson's personal vehicle expenses. In connection with this claim, the court awarded the association $64,834 for management fees and $14,592 for vehicle expenses.

We conclude that both the self-dealing and the breach of fiduciary duty allegations relating to the management fee and the personal vehicle expenses sound in tort, not in contract. As we previously outlined in part II B of this opinion, the duty not to engage in self-dealing as a fiduciary is imposed by § 47-245 (a) and common-law tort principles. To clarify their claims, the plaintiffs specifically used the talismanic phrases "self-dealing," and "a breach of fiduciary duty." Thus, on the basis of this language and the fact that the plaintiffs do not cite a particular provision of the declaration that was violated, we conclude that both of these claims are tort claims.

In sum, we conclude that the plaintiffs' claim regarding the vehicle expenses and management fee sounds in tort and, thus, is time barred pursuant to § 52-577. We further conclude that the remainder of the plaintiffs' claims sound in both tort and contract. As to those

claims, the plaintiffs are entitled to the benefit of the longer breach of contract statute of limitations. Consequently, those claims are not time barred pursuant to § 52-576.[23]

### III

The defendants next claim that the court improperly awarded the association damages on the plaintiffs' claim that the defendants improperly assessed common charges because it made a special arrangement with the owner of the restaurant unit in which the defendants agreed that the restaurant was exempt from paying common charges. The defendants argue, inter alia, that the court's damage award is inconsistent with its prior finding that the association had not been damaged because "the association collected 100 percent of the common expenses of the condominium from the unit owners . . . ." We agree.

We begin by setting forth the applicable standard of review and relevant legal principles governing our resolution of the defendants' third claim. "The construction of a judgment is a question of law for the court. . . . As a general rule, judgments are to be construed in the same fashion as other written instruments. . . . The determinative factor is the intention of the court as gathered from all parts of the judgment. . . . The judgment should admit of a consistent construction as a whole. . . . To determine the meaning of a judgment, we must ascertain the intent of the court from the language used and, if necessary, the surrounding circumstances." (Internal quotation marks omitted.) *Wheelabrator Bridgeport, L.P.* v. *Bridgeport*, 320 Conn. 332, 355, 133 A.3d 402 (2016).

"Where a court's opinion contains fundamental logical inconsistencies, it may warrant reversal." *In re Jacob W.*, 178 Conn. App. 195, 217, 172 A.3d 1274 (2017), aff'd, 330 Conn. 744, 200 A.3d 1091 (2019); see *Sun Val, LLC* v. *Commissioner of Transportation*, 330 Conn. 316, 325, 193 A.3d 1192 (2018) ("[w]hen . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct" [internal quotation marks omitted]); *Kaplan & Jellinghaus, P.C.* v. *Newfield Yacht Sales, Inc.*, 179 Conn. 290, 292, 426 A.2d 278 (1979) ("[a] trial court's conclusions are not erroneous unless they violate law, logic, or reason or are inconsistent with the subordinate facts in the finding"). "[A] judgment rendered [on] facts found will not be reversed or set aside unless . . . a conclusion has been reached, or an inference drawn, from a fact, many facts, or the facts found, which affects the judgment rendered in material degree and is legally or logically inconsistent with that or those facts . . . ." (Internal quotation marks omitted.) *O'Connor* v. *Larocque*, 302 Conn. 562, 576 n.12, 31 A.3d 1 (2011).

In the present case, the court first addressed the plaintiffs' claim that the defendants utilized an improper formula to determine the amount of common charges. The court concluded that: "The defendants do not dispute that the formula used by the declarant for the calculation of common charges based on use categories and square footage groups is not consistent with the provisions of the declaration. . . . The plaintiffs argue that the failure to follow the amended declaration in assessing common charges to the unit owners caused great damage to the unit owners and the association, but present no manner in which the court can calculate such damages. The defendants argue that since the association collected 100 percent of the common expenses of the condominium from the unit owners, and since the association is only claiming relief here, there is no basis for this court to find that the association has been damaged by the use of the improper formula. The court agrees. The damages, if any, would have been sustained by individual unit owners."

The court later addressed the plaintiffs' claim that the defendants improperly assessed common charges because it made a special arrangement with the owner of the restaurant unit in which they agreed that the restaurant would be exempt from paying common charges. The court concluded that: "[I]t was improper for Benson to make an arrangement with the restaurant that was not consistent with the provisions of the declaration," and that "the restaurant did not pay its proper share of the common expenses." As for damages, the court recognized that "[t]he defendants claim that even if any funds are due from the restaurant it should be the restaurant that pays and not the defendants." Nevertheless, the court held that "the defendants are the ones who established this system of special treatment of the restaurant and therefore should be responsible to the association for any resulting losses to the association. Based on the calculations by the plaintiffs,[24] which the court accepts, that amount is $126,766.11." (Footnote added.)

We conclude that these two determinations are logically inconsistent. The court first determined that the association was not harmed on the basis of its finding that the association had collected 100 percent of the common charges to which it was entitled. The court next determined that the association suffered damages because the restaurant unit had not been assessed its percentage of the common charges. The award of damages for common charges to the association is inconsistent with the court's factual finding that the association, itself, was not damaged because the association collected 100 percent of the common charges. Put another way, because the association collected 100 percent of the common charges due, the fact that the restaurant did not pay its share of common charges had no effect

on the total amount of common charges collected by the association. Instead, the failure of the restaurant to pay its share of common expenses damaged only the individual unit owners because they, consequently, had to pay an increased amount of common charges each year. The individual unit owners, however, did not seek damages. Therefore, we reverse the court's award of damages to the association for common charges that should have been assessed to the restaurant because that award is logically inconsistent with the court's finding that the association had collected 100 percent of the common charges due.

IV

The defendants' final claim is that the court improperly determined that Benson individually was liable.[25] The defendants argue that the court erroneously found that the facts of the present case justified piercing the corporate veil to hold Benson individually liable for the misconduct of the declarant, pursuant to the "instrumentality" rule. We agree.

We begin by setting forth the applicable standard of review and relevant legal principles governing our resolution of the defendants' fourth claim. "Whether the circumstances of a particular case justify the piercing of the corporate veil presents a question of fact." (Internal quotation marks omitted.) *Naples* v. *Keystone Building & Development Corp.*, 295 Conn. 214, 234, 990 A.2d 326 (2010). "Accordingly, we defer to the trial court's decision to pierce the corporate veil, as well as any subsidiary factual findings, unless they are clearly erroneous. . . . A court's determination is clearly erroneous only in cases in which the record contains no evidence to support it, or in cases in which there is evidence, but the reviewing court is left with the definite and firm conviction that a mistake has been made." (Citation omitted; internal quotation marks omitted.) *Commissioner of Environmental Protection* v. *State Five Industrial Park, Inc.*, 304 Conn. 128, 138, 37 A.3d 724 (2012).

"Courts will . . . disregard the fiction of a separate legal entity to pierce the shield of immunity afforded by the corporate structure in a situation in which the corporate entity has been so controlled and dominated that justice requires liability to be imposed on the real actor. . . . We have affirmed judgments disregarding the corporate entity and imposing individual stockholder liability when a corporation is a mere instrumentality or agent of another corporation or individual owning all or most of its stock. . . .

"The instrumentality rule requires, in any case but an express agency, proof of three elements: (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked

so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of [the] plaintiff's legal rights; and (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of. . . .

\* \* \*

"The concept of piercing the corporate veil is equitable in nature. . . . No hard and fast rule, however, as to the conditions under which the entity may be disregarded can be stated as they vary according to the circumstances of each case. . . . Ordinarily the corporate veil is pierced only under exceptional circumstances, for example, where the corporation is a mere shell, serving no legitimate purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice. . . . The improper use of the corporate form is the key to the inquiry, as [i]t is true that courts will disregard legal fictions, including that of a separate corporate entity, when they are used for fraudulent or illegal purposes. Unless something of the kind is proven, however, to do so is to act in opposition to the public policy of the state as expressed in legislation concerning the formation and regulation of corporations." (Citations omitted; internal quotation marks omitted.) *Naples* v. *Keystone Building & Development Corp.*, supra, 295 Conn. 231-34.

The trial court set forth the following subsidiary factual findings in support of its determination to pierce the declarant's corporate veil. "Benson is in complete control of the . . . declarant in that at all times relevant he was president of the declarant and its chief operating officer; he owns all or almost all of the stock of the corporate declarant; and he exercised complete domination of the finances and policy and business practices of the corporate declarant."[26] "From 1998 to 2009, Benson was in complete control of the association. During that time Benson appointed the members of the [executive] board . . . of the association who were himself, his wife, Ann M. Benson, and his son, Paul D. Benson, Jr." "From 1998 to 2009 Benson created the budgets for the association and determined the monthly common charges. On the advice of counsel, Benson did not use the formula set forth in the declaration for allocation of expenses and the determination of common charges for each unit." "From 1998 to 2009 Benson also made all the decisions as to what expenses the association should pay. He made the decisions as to who was responsible for a repair to a unit. If a roof needed repair he charged the association. He interpreted the declaration as providing that the Association was responsible for the decks, roofs, and siding. The

declaration, however, provides otherwise.

"During the time Benson managed the association, he expended the funds of the association and conducted its business as he saw fit, without concern as to whether his actions were consistent with the declaration or the [act]." "Benson directed Elite [Property Management] not to follow the terms of the declaration as to how common charges should be assessed but to continue to use the methodology he had developed." "The record is replete with invoices for work Benson charged to the association both for his own units as well as those owned by others which should not have been. Benson also offset his charges to the association against the condominium fees he owed the association. Since Benson or others were responsible for expenses he charged to the association, it was improper for him to do so." "The court agrees that, based on the above findings and conclusions, the . . . association is entitled to damages from the defendants." On the basis of these findings the court held that Benson individually was liable to the association pursuant to the instrumentality rule.[27]

We conclude that the court's decision to pierce the corporate veil on the basis of these facts was clearly erroneous. Although the court set forth findings with respect to the first element of the instrumentality rule, namely, that Benson exercised sufficient control over the declarant; see General Statutes § 47-202 (1) (defining control over declarant); the court's decision is devoid of any findings as to the second and third elements of the instrumentality rule.

With respect to the second element, the court set forth an exhaustive list of the misconduct of Benson, however, the court's decision does not contain any findings as to "the key to the inquiry;" *Naples* v. *Keystone Building Development Corp.*, supra 295 Conn. 233; namely, that Benson improperly used his control over the declarant's corporate form to accomplish this misconduct. The court found that Benson improperly assessed common charges, determined which party was responsible for repairs, expended funds of the association, and directed subsequent management to continue to assess common charges. The court did not find, however, that Benson utilized his control over the declarant to accomplish these actions. Instead, the court found that these actions by Benson were taken in his capacity as a member of the executive board, which controlled the association, or in his individual capacity. Put another way, the breaches of duty that the court attributed to Benson arose out of his direct relationship with the association through his position on the executive board, not through his role as owner of the declarant. Although the declarant appointed Benson, his wife, and his son to the executive board during the period of declarant control, the declarant itself was not on the

board and did not make the decisions that are the subject of the plaintiffs' complaint. Consequently, although Benson might be individually responsible for certain wrongful conduct, he was not sued directly for such conduct. Instead, the plaintiffs sought only to hold him derivatively liable for the conduct of the declarant. Because Benson's conduct did not arise out of his control of the declarant, the plaintiffs failed to satisfy the second element of the instrumentality rule. Furthermore, even if Benson was acting on the behalf of the declarant, the court's decision does not find that the declarant was a mere shell, serving no legitimate purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice. To the contrary, the undisputed evidence established that the declarant was primarily and legally involved in the development of Pasco Common.

With respect to the third element, the court's decision does not find that Benson's control over the declarant proximately caused the association's injuries. The court did find that the association was "entitled to damages from the defendants," but its decision does not find that Benson's control over the declarant proximately caused those injuries. As stated previously, Benson's wrongful conduct, alone, does not satisfy the requirements of the instrumentality rule; rather, Benson can be held individually liable only if he proximately caused losses by the use of his control over the declarant as a shell corporation. Control over the association through his position on the executive board is not sufficient. In the absence of these required findings, the facts of this case do not present the exceptional circumstances in which to contravene the public policy of this state. Therefore, we conclude that the court erroneously held Benson individually liable on the basis of the theory pursued by the plaintiffs.

The judgment is reversed in part as to count ten and in part as to the award of damages, and the case is remanded with direction to render judgment in favor of Benson as to count ten, and to vacate the damages award of $64,834 for management fees, $14,592 for vehicle expenses, and $126,766.11 for fees that should have been charged to the restaurant; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] The eighteen individual members of the association are Steven Fowler, Rene Dupuis, Thomas DeForge, Brian U. Mozzer, Michael S. O'Neill, Sheryl Marinone, Hari Grunupudi, Brian C. Cassidy, Robert Torneo, John Bartolucci, Michael Barrett, Deb Romero, Karen Bona, Michael R. O'Connell, David Santiago, Catherine Peirolo, Robert D. Rybick, and Shaun O'Conner.

[2] General Statutes § 52-577 provides: "No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."

[3] The defendants also claim that the court improperly altered its memorandum of decision in response to an order of articulation from this court to determine that Benson individually was liable to the plaintiffs pursuant to count ten of the complaint. In light of our conclusion in part IV of this opinion that the court improperly determined that Benson individually was

liable, we need not reach this claim.

Furthermore, the defendants amended their appeal to include a challenge to the court's judgment, issued after it rendered judgment for the plaintiffs on their complaint, in which it awarded attorney's fees and costs to the plaintiffs. Although the defendants offer no analysis in their briefs on appeal, this claim appears to be premised on the fact that the plaintiffs are entitled to attorney's fees and costs, pursuant to General Statutes § 47-253 (d), only if "the declarant is liable to the association . . . ." We reject this claim on the basis of our conclusion that certain claims against the declarant are not time barred by the statute of limitations and, thus, that the declarant is liable to the association.

[4] General Statutes § 47-202 (16) defines "Development rights" as "any right or combination of rights reserved by a declarant in the declaration to (A) add real property to a common interest community; (B) create units, common elements, or limited common elements within a common interest community; (C) subdivide units or convert units into common elements; or (D) withdraw real property from a common interest community."

[5] General Statutes § 47-202 (33) defines "Special declarant rights" as "rights reserved for the benefit of a declarant to (A) complete improvements indicated on surveys and plans filed with the declaration or, in a cooperative, to complete improvements described in the public offering statement pursuant to subdivision (2) of subsection (a) of section 47-264; (B) exercise any development right; (C) maintain sales offices, management offices, signs advertising the common interest community, and models; (D) use easements through the common elements for the purpose of making improvements within the common interest community or within real property which may be added to the common interest community; (E) make the common interest community subject to a master association; (F) merge or consolidate a common interest community with another common interest community of the same form of ownership; (G) appoint or remove any officer of the association or any master association or any executive board member during any period of declarant control; (H) control any construction, design review or aesthetic standards committee or process; (I) attend meetings of the unit owners and, except during an executive session, the executive board; or (J) have access to the records of the association to the same extent as a unit owner."

[6] General Statutes § 47-245 (d) provides in relevant part: "[T]he declaration may provide for a period of declarant control of the association, during which a declarant, or persons designated by the declarant, may appoint and remove the officers and members of the executive board. . . ."

[7] Although the declaration provided the declarant the ability to create a maximum of 213 units, there never was enough land to do so. As of June, 2009, Benson owned forty-eight of the seventy-six units that had been created. As of December, 2015, Benson, and the entities he controlled, owned thirty-seven of the eighty-one units that had been created.

[8] In particular, the complaint contains allegations that the declarant violated the declaration in counts one, three, and eight.

[9] General Statutes § 52-576 (a) provides in relevant part: "No action for an account, or on any simple or implied contract, or on any contract in writing, shall be brought but within six years after the right of action accrues . . . ."

[10] The court's memorandum of decision actually stated that the court "finds the issues for the defendants on the . . . tenth count . . . ." After the defendants filed their principal appellate brief, the plaintiffs filed a "motion for permission to file a late motion for rectification and articulation," and a corresponding motion for articulation, in which they requested that this court order the trial court to correct its conclusion that it rendered judgment in favor of Benson on count ten because the entirety of its decision found otherwise. This court denied the plaintiffs' motion for permission to file a late motion for rectification and articulation, but, nevertheless, we ordered, sua sponte, the trial court to articulate whether it disposed of count ten against Benson and its factual and legal basis therefor. In response, the trial court issued an articulation in which it stated that it had found count ten against Benson, rectified two sentences of its conclusion, and detailed the corresponding factual and legal basis therefor. The defendants challenge the propriety of the court's articulation in this appeal, but we need not reach this claim. See footnote 3 of this opinion.

[11] General Statutes § 47-253 (d) provides in relevant part: "Any statute of limitation affecting the association's right of action against a declarant under this chapter is tolled until the period of declarant control terminates. . . ."

[12] General Statutes § 47-245 (d) provides in relevant part: "[T]he declaration may provide for a period of declarant control of the association, during which a declarant, or persons designated by the declarant, may appoint and remove the officers and members of the executive board. A declarant may voluntarily surrender the right to appoint and remove officers and members of the executive board before the period ends. In that event, the declarant may require, during the remainder of the period, that specified actions of the association or executive board, as described in a recorded instrument executed by the declarant, be approved by the declarant before they become effective. Regardless of the period provided in the declaration, a period of declarant control terminates no later than the earlier of: (1) Sixty days after conveyance of sixty per cent of the units that may be created to unit owners other than a declarant . . . or, if no such number is specified, after conveyance to unit owners other than the declarant of three hundred units; (2) two years after all declarants have ceased to offer units for sale in the ordinary course of business; (3) two years after any right to add new units was last exercised; or (4) the date the declarant, after giving notice in a record to unit owners, records an instrument voluntarily surrendering all rights to control activities of the association."

[13] The plaintiffs do not challenge the court's judgment in favor of the declarant on count nine of their complaint.

[14] The court incorrectly concluded that § 8.9 adopted the language of § 47-245 (d). Although similar, the language of the two provisions is different. To the extent that the terminating events in § 8.9 of the declaration are in conflict with those prescribed by § 47-245 (d), the provisions of the statute prevail. See General Statutes § 47-203 ("Except as expressly provided in this chapter, its provisions may not be varied by agreement, and rights conferred by it may not be waived").

[15] Neither party contends, and the court did not find, that any of the four terminating events prescribed by § 47-245 (d) occurred so as to end the period of declarant control prior to its expiration on August 12, 2008.

[16] We note that the plaintiffs did not argue, and the court did not conclude, that the statute of limitations was tolled by the continuing course of conduct doctrine, fraudulent concealment, or some other equitable tolling theory. See *Vaccaro* v. *Shell Beach Condominium, Inc.*, 169 Conn. App. 21, 44, 148 A.3d 1123 (2016) (determining whether continuing course of conduct doctrine applied to toll statute of limitations applicable to condominium action), cert. denied, 324 Conn. 917, 154 A.3d 1008 (2017).

[17] The defendants also argue that § 47-253 (d) applies only to toll the statute of limitations applicable to claims brought by the association against the declarant. We agree. The definitive language of § 47-253 (c) and (d) unambiguously provides that the declarant is liable to the association and that a statute of limitations applicable to such an action is tolled. These provisions cannot be understood to also toll claims brought against an individual, like Benson, who controls and operates the declarant. Such a reading would require us to import words into the statute, which we are prohibited from doing. Accordingly, pursuant to § 47-253 (d), the statute of limitations applicable to an association's right of action is tolled only as to actions against a declarant until the period of declarant control terminates. The parties have not addressed, though, how this conclusion impacts the only count against Benson individually, count ten, which seeks to hold Benson derivatively liable for the declarant's actions under a piercing the corporate veil theory. Because we conclude in part IV of this opinion that the court erroneously found that the plaintiffs proved this claim, we need not address Benson's statute of limitation special defense.

[18] Our review of which statute of limitations applies to the plaintiffs' claims against the declarant is limited to the first eight counts of their complaint. We need not analyze count nine, the CUTPA count against the declarant, because the court found for the declarant on that count and the plaintiffs do not challenge that ruling on appeal. See footnote 13 of this opinion. We also need not analyze count ten, the piercing the corporate veil count against Benson, because we conclude in part IV of this opinion that the court erroneously found in favor of the plaintiffs on that count.

Furthermore, the first eight counts all are against the declarant, and not Benson. The defendants filed a request to revise the plaintiffs' original complaint in which they requested that the plaintiffs identify which defendant each count applied to. In response, the plaintiffs filed their operative complaint in which they specifically identified that the first eight counts are against the declarant. Accordingly, to the extent that the actions of Benson are alleged in the first eight counts, those allegations do not seek

to impose individual liability on Benson.

[19] Despite the fact that the defendants brief this issue in their principal and supplemental briefs on appeal, the plaintiffs do not present a counter argument in their briefs. Nevertheless, at oral argument before this court, the plaintiffs' counsel maintained that the contract statute of limitations should apply because the declaration operates as a contract among the parties. The lack of analysis by the plaintiffs, although unfortunate, does not preclude our plenary review of this claim because it is the burden of the defendants, as the parties claiming error, to raise and brief their claims. See *Eubanks* v. *Commissioner of Correction*, 329 Conn. 584, 598, 188 A.3d 702 (2018); *Estate of Rock* v. *University of Connecticut*, 323 Conn. 26, 33, 144 A.3d 420 (2016). Further, the defendants were aware that the contract statute of limitations may be applicable because they raised that issue as a special defense to the plaintiffs' claims.

[20] We note that the act contains a three year statute of limitations applicable to actions alleging a breach of an implied or express warranty of quality. General Statutes § 47-277 provides in relevant part: "(a) Unless a period of limitation is tolled under section 47-253, a judicial proceeding for breach of any obligation arising under section 47-274 or 47-275 shall be commenced within three years after the cause of action accrues. . . ." See *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 28-30, 717 A.2d 77 (1998) (analyzing provisions of § 47-277). General Statutes § 47-274 governs express warranties made by a seller to a purchaser of a unit, and General Statutes § 47-275 governs implied warranties made by a declarant to the purchaser of a unit as to the condition of the unit. None of the plaintiffs' claims sounds in breach of warranty and neither party has argued that § 47-277 applies, thus, we need not discuss it further.

[21] The defendants do not challenge on appeal the propriety of the approach taken by the court. They do specifically argue, however, as part of their claim that the court erroneously awarded the association damages; see part III of this opinion; that the complaint does not allege that the declarant prevented the association from collecting 100 percent of the common charges, yet, the court awarded damages for fees that should have been charged to the restaurant but were not. This argument is belied by their posttrial brief in which they explicitly recognized that the plaintiffs had made such a claim and argued that the plaintiffs had failed to prove it. Thus, to the extent that this argument is advanced by the defendants in support of their statute of limitations claim on appeal, we decline to consider it because it is contrary to their position at trial. See *Buxenbaum* v. *Jones*, 189 Conn. App. 790, 811,      A.3d      (2019) (party cannot adopt one position at trial and then adopt different position on appeal because doing so would ambush trial judge and opposing party); see also *Stamford Landing Condominium Assn., Inc.* v. *Charlene Lerman*, supra, 109 Conn. App. 271–72 ("[o]ur Supreme Court has recognized . . . that where the trial court ha[s] in fact addressed a technically unpleaded claim that was actually litigated by the parties, it [i]s improper for the Appellate Court to reverse the trial court's judgment for lack of such an amendment [to the complaint]" [internal quotation marks omitted]).

[22] It would serve no purpose for us to determine which statute of limitations applied to the plaintiffs' claims on which the court determined that they failed to prove damages and/or awarded them no relief. Such discussion would be purely academic because it would have no effect on the final outcome of this case. See *Gladstein* v. *Goldfield*, 325 Conn. 418, 425, 159 A.3d 661 (2017) (appellate courts must refuse to entertain purely academic questions).

[23] Finally, we reject the defendants' argument that *Bellemare* v. *Wachovia Mortgage Corp.*, supra, 284 Conn. 193, compels the conclusion that all of the plaintiffs' claims are tort claims. In that case, our Supreme Court considered whether the tort or contract statute of limitations applied to a count that alleged that "the defendant had violated [General Statutes] § 49-8 by failing to provide a release of mortgage within sixty days of the satisfaction of the underlying debt." Id., 198. Our Supreme Court held that the tort statute of limitations applied to such a claim because, among other reasons, "the duty to release the mortgage that the plaintiff complained of in . . . her complaint did not arise from the mortgage contract but, rather, from § 49-8, which also prescribes damages for a breach of that statutory duty"; id., 201; that "[a]pplying multiple statutes of limitation to a singular duty created by statute is an odd result, one that we generally attempt to avoid"; id., 202; and that "the cause of action created by § 49-8 is akin to an action for slander of title," which is a tort. Id.

*Bellemare* is inapplicable because, in the present case, the parties actually litigated and the court decided whether the defendants breached the declaration in addition to committing statutory violations. In addition, although some of the plaintiffs' claims rely on common-law tort language, that phrasing does not apply to the concurrent breach of contract claims.

[24] The plaintiffs' calculation, which is set forth in a one page spreadsheet, was submitted as an exhibit to their posttrial brief. Therein, the plaintiffs calculate the amount of annual common expenses that should have been assessed to the restaurant unit by multiplying the restaurant's percentage share of the total square footage at Pasco Common by the total income of the association. The plaintiffs applied this calculation for each fiscal year from 1998 through 2014.

[25] The defendants preliminarily argue that the court's articulation as to whether it held Benson individually liable was improper. See footnote 3 of this opinion. We need not decide that claim because assuming, without deciding, that the court's articulation was proper, we conclude that the court erroneously found that Benson individually was liable.

[26] This allegation in the plaintiffs' complaint was admitted by the defendants in their answer. See *Straw Pond Associates*, *LLC* v. *Fitzpatrick, Mariano & Santos*, *P.C.*, 167 Conn. App. 691, 708, 145 A.3d 292 ("Factual allegations contained in pleadings upon which the cause is tried are considered judicial admissions and hence irrefutable as long as they remain in the case. . . . The admission of the truth of an allegation in a pleading is a judicial admission conclusive on the pleader." [Internal quotation marks omitted.]), cert. denied, 323 Conn. 930, 150 A.3d 231 (2016).

[27] The court, in its articulation, also cited as legal support for its conclusion the "identity" rule for piercing the corporate veil. See *Naples* v. *Keystone Building & Development Corp.*, supra, 295 Conn. 232. The defendants argue on appeal, and we agree, that the plaintiffs did not allege, or rely on, the identity rule before the trial court and, thus, they cannot prevail on such a theory on appeal. See *Nutmeg Housing Development Corp.* v. *Colchester*, 324 Conn. 1, 13 n.4, 151 A.3d 358 (2016) (declining to review on appeal claim not alleged in complaint and raised for first time on appeal). We likewise decline to review the plaintiffs' claim that Benson individually was liable for actions taken in his personal capacity because this claim was neither alleged nor ruled on by the court. See footnote 21 of this opinion.

Furthermore, we note that on June 25, 2019—three months after oral argument before this court and six years after the plaintiffs commenced this action—our legislature passed No. 19-181 of the 2019 Public Acts (P.A. 19-181), which codifies the instrumentality test for veil piercing. P.A. 19-181 implicitly abandons the identity rule by virtue of the language in § 2 that "a court shall make such [a veil piercing] determination exclusively in accordance with the provisions of this section . . . of this act." P.A. 19-181 does not impact our resolution of the present appeal because the plaintiffs did not rely on the identity rule before the trial court, and because "the legislature explicitly stated that it intended . . . P.A. 19-181 to apply prospectively, that is, on or after July 9, 2019, the date the governor signed the legislation." *McKay* v. *Longman*, 332 Conn. 394, 432 n.27,    A.3d    (2019).